# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JACKIE GREEN** | **CIVIL ACTION** |
| **VERSUS** | **NO. 14-2073** |
| **BURL CAIN, WARDEN** | **SECTION "H" (3)** |

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the petition, this Court has determined that a federal evidentiary hearing is unnecessary at this time. See 28 U.S.C. § 2254(e)(2). For the following reasons, this Court recommends that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

## I.    STATE COURT FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Jackie Green, is incarcerated in Louisiana State Penitentiary in Angola, Louisiana.[1] On August 13, 2009, Green was indicted in Orleans Parish for second degree murder.[2] Green was tried before a jury on November 10 and 12, 2009, and was found guilty as

---

[1] Rec. Doc. No. 1.
[2] St. Rec. Vol. 1 of 5.

charged.[3]  At a hearing held on November 20, 2009, the state trial court sentenced Green to life

imprisonment without the possibility of parole.[4]  Green filed a direct appeal to the Louisiana

Fourth Circuit, which the court denied on March 16, 2011.[5] Green then filed a writ application

to the Louisiana Supreme Court which was denied on February 10, 2012, without explanation.[6]

Green's conviction became final ninety days later on May 10, 2012, when he did not file a writ

application with the United States Supreme Court.[7]

On December 29, 2012 Green filed an application for post-conviction relief in Orleans

Parish District Court.[8]  Judge Karen Herman denied Green's application on May 22, 2013.[9]

Green's subsequent writs to the Louisiana Fourth Circuit and Louisiana Supreme Court

appealing Judge Herman's decision were denied on September 26, 2013, and July 21, 2014

respectively.[10] On September 5, 2014, the clerk of court filed Green's petition for federal habeas

corpus,[11] and on March 27, 2015, the State responded and conceded that Green's petition was

timely filed.[12]

## II.   GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively

overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.  Amended subsections

2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions

of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in

---

[3] St. Rec. Vol 1 of 5; Trial Minutes, 11/10/09 and 11/12/09.
[4] St. Rec. Vol 1 of 5; Sentencing Minutes, 11/20/09.
[5] St. Rec. Vol. 1 of 5; Appeal Brief, 2010-KA-0454, 7/16/10; St. Rec. Vol. 2 of 5; State v. Green, 62 So. 3d 229 (La.App. 4th Cir. 2011).
[6] State ex rel. Green v. State, 80 So. 3d 476 (La. 2012).
[7] See Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir.2003) (citing 28 U.S.C. § 2244(d)(1)(a)).
[8] St. Rec. Vol. 1 of 5.
[9] Id.
[10] Id.
[11] Rec. Doc. No. 1.
[12] Rec. Doc. No. 15.

reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "*was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.*" 28 U.S.C. § 2254(d)(1) (emphasis added). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

<u>Wooten v. Thaler</u>, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." <u>White v. Woodall</u>, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; *it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.* AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

<u>Id</u>. (citations and quotation marks omitted) (emphasis added).

Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." <u>Bell</u>, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief. <u>Puckett v. Epps</u>, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted)(emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein.  White, 134 S. Ct. at 1701.

## III.   ANALYSIS

### 1.   Suppression of Green's Statement

Green's first claim is that the trial court improperly admitted a statement that he made to his mother while he was being held in a police interrogation room.[13]  Green argues that admission of these statements infringed on his right to privacy under the Fourth Amendment to the United

---

[13] Rec. Doc. No. 1 p. 35-46.

States Constitution and violated the Louisiana Electronics Surveillance Act, La. Stat. Ann. § 15:1303.[14] For reasons discussed below, neither claim is appropriate on federal habeas review.

Green's claim, that the evidence should have been suppressed pursuant to the Fourth Amendment, is not cognizable on federal habeas review.[15] Stone v. Powell, 428 U.S. 465, 480–81, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). In Stone, the United States Supreme Court held "that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. at 494 (footnotes omitted). A "full and fair" hearing as contemplated by Stone refers to thoughtful consideration by the factfinder and at least the availability of meaningful appellate review by a higher state court. Stone, 428 U.S. at 480; Davis v. Blackburn, 803 F.2d 807, 808 (5th Cir. 1986) (per curium) (quoting O'Berry v. Wainwright, 546 F.2d 1204, 1213 (5th Cir. 1977)).

The United States Court of Appeals for the Fifth Circuit has further interpreted an "opportunity for full and fair litigation" to mean just that, "an opportunity." Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978); Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002), cert. denied, 537 U.S. 1196 (2003). "If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, Stone bars federal habeas corpus consideration of that claim …." Caver, 577 F.2d at 1192 (citations omitted).  The Fifth Circuit has also held that the Stone bar applies despite an error by the state court on procedural grounds or the merits of the

---

[14] Id.

[15] See Payne v. Bauman, No. 2:09-CV-253, 2011 WL 4434952, at *5 (W.D. Mich. Aug. 25, 2011) (applying the Stone bar to a claim that the defendant's right to privacy under the fourth amendment was violated when police eavesdropped on his conversation with a third party).

Fourth Amendment claim. <u>Swicegood v. Alabama</u>, 577 F.2d 1322, 1324–25 (5th Cir. 1978); <u>Williams v. Brown</u>, 609 F.2d 216, 219–20 (5th Cir 1980).[16]

Thus "'in the absence of allegations that the processes provided by a state to fully and fairly litigate Fourth Amendment claims are routinely or systematically applied in such a way as to prevent the actual litigation of Fourth Amendment claims on their merits,' <u>Stone v. Powell</u> [bars] petitioner's claim even [if] the habeas court's procedural mistakes thwarted the presentation of the claim." <u>Andrews v. Collins</u>, 21 F.3d 612, 632 (5th Cir. 1994) (quoting <u>Williams</u>, 609 F.2d at 220).

Green has not shown that he was denied the opportunity to litigate his Fourth Amendment claim, much less proven that the State has systemically prevented defendants from litigating Fourth Amendment issues. To the contrary, the record clearly demonstrates that Green was given every opportunity to litigate his Fourth Amendment claim, and that Green seized on that opportunity at every turn; Green challenged admission of his statement during a pre-trial motions hearing, on direct appeal to the Louisiana Fourth Circuit and finally in his application for post-conviction relief.[17] Thus, without any plea or proof by Green that he was denied a full and fair hearing in state court, his request for federal habeas relief based upon his Fourth Amendment violation must be denied. <u>Stone</u>, 428 U.S. at 494–95 n. 37; <u>Bell v. Lynaugh</u>, 828 F.2d 1085, 1091–92 (5th Cir. 1987); <u>Davis</u>, 803 F.2d at 1372.

Green's second claim, that the admission of his statement violated the Louisiana Electronic Surveillance Act, is also not cognizable on habeas review because the claim is purely one of state law.[18] "[A] state court's interpretation of state law, including one announced on direct appeal of

---

[16] <u>See also</u> <u>Woodard v. Thaler</u>, 702 F.Supp.2d 738, 759–60 (S.D. Tx. 2010) ("Even if the state court improperly applied its own procedural law in refusing to consider Woodard's Fourth Amendment argument," the <u>Stone</u> bar still applies.) (citing <u>Moreno v. Dretke</u>, 450 F.3d 158, 167 (5th Cir. 2006)).

[17] St. Rec. Vol 1 of 5; (Post-Conviction Judgement) (Minute Entry 9/11/09); (4th Circuit Brief on Direct Appeal).

[18] La. Stat. Ann. § 15:1301 et seq.

the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (citing Estellev. McGuire, 502 U.S. 62, 67–68; Mullaney v. Wilbur, 421 U.S. 684, 691 (1975)).  Federal courts are prevented from ruling on a state court's application of its own laws because it is not the job of federal courts to "sit as 'super' state supreme court[s] in habeas corpus proceedings ...." Wilkerson v. Whitley, 16 F.3d 64, 67 (5th Cir. 1994) (citing Cronnon v. Alabama, 587 F.2d 246, 250 (5th Cir. 1979); Cook v. Morrill, 783 F.2d 593, 596 (5th Cir.1986)); See also Swarthout v. Cooke, —— U.S. ——, 131 S.Ct. 859, 861 (2011) (federal habeas review does not lie for errors of state law).  Thus, Green's challenge pursuant to the Louisiana Electronic Surveillance Act is not reviewable in this federal habeas proceeding.

## 2.   Sufficiency of the Evidence

Green's next claim is that his conviction for second degree murder was irrational under the facts presented at trial.[19]  Specifically, Green contends that a rational jury would have found him guilty of manslaughter, rather than second degree murder, in light of the mitigating facts presented at trial.  In response, the State argues that Green's claim must fail under 28 U.S.C. § 2254(d)(1) because the Louisiana Fourth Circuit correctly identified prevailing federal law and did not apply that law unreasonably to Green's case.[20]

In Jackson, the United States Supreme Court held that, in assessing a sufficiency claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  And the United States Fifth Circuit Court of Appeal elaborated on the Jackson standard for when a defendant bears the burden of proof, explaining that the test is "whether, viewing the evidence in the light most favorable to the state, any rational trier of fact

---

[19] Rec. Doc. No. 1, P. 46.
[20] Rec. Doc. No. 15, p. 23-26.

could have found beyond a reasonable doubt that [Mr. Green] did not prove by a preponderance of the evidence that he was [under the influence of sudden passion] at the time of the offense." Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008)

The core of Green's argument is that the evidence at trial proved that he committed the killings only after he was 'provoked' by the sight of his ex-wife, Marilyn Green, having sex with Lionel Nelson.[21]   In support of his claim, Green argues that neither Marilyn Green, nor Lionel Nelson, were killed in the bedroom and thus Green did not have intent to kill until after seeing the two have sex.[22] Green also claims that he did not 'hunt' down Lionel Nelson, as the State claims, but instead that Lionel Nelson lunged at him from the bathroom.[23] Green's support for this argument is that there was no damage to the barricade that Lionel Nelson made for himself inside of the bathroom.[24] Finally, Green contends that he only shot each victim once, not twice as the State argued at trial.[25]

On direct appeal, the Fourth Circuit rejected Green's argument and gave the following analysis:

> "… Defendant's testimony, as well as that of his step-daughter, Cierra Williams, reflects that the relationship between Defendant and his ex-wife was unstable for many years prior to the murders. They engaged in violent verbal arguments, and Defendant made verbal threats to Marilyn. Fifteen days before the murders, *Defendant, in a cell phone call, verbally threatened to kill Marilyn. During that incident, Defendant, unprovoked, followed Cierra and Marilyn in his car, bumping the back of the car and demanding to speak to Marilyn on Cierra's cell phone. When Marilyn refused to speak to him, he told Cierra that he was going to kill the "b- - - -".* Williams reported the incident to the police, but Defendant denied the threat. This incident, which occurred shortly before the murders, indicates that Defendant was capable of engaging in violent actions directed at Marilyn.

---

[21] Rec. Doc. No. 1, p. 46-49.
[22] Rec. Doc. No. 1, p. 48-49.
[23] Id.
[24] Id.
[25] Id.

*On the night of the murders, Defendant heard Marilyn engaging in sex, and by her turning the lights off, he was aware that she did not want to answer the door.* Disregarding the obvious, Defendant, uninvited, used his key to enter the house through the kitchen door. *[Green] knew where Marilyn and Nelson were and what they were doing; he went directly to the bedroom where he heard Marilyn's voice. Accordingly, it was not unreasonable for the jury to conclude that Defendant was not suddenly surprised when he saw the victims engaged in sexual intercourse.* Furthermore, Defendant admitted that the shotgun was not loaded when he retrieved it from under the mattress, and that the shells were inside of a pouch attached to the butt of the gun. Further, the firearms testimony indicated that the murder weapon had to be opened and loaded one shell at a time. Each spent shell had to be removed before another live shell was inserted. During the time it took Defendant to load the shotgun, Lionel Nelson had sufficient time to dress and lock himself inside the bathroom in the hall; Marilyn had time to go into the living room area, dress, break free of Defendant's grasp, open the front door, and attempt to flee from the house. Nelson was shot when he exited the bathroom after hearing Marilyn scream; Marilyn was shot after fleeing from the house. … Defendant had to open the shotgun a minimum of four times, load it four times, and unloaded it four times to shoot the victims. Thus, Defendant had sufficient time to reflect on his actions. The record does not support Defendant's contention of provocation and that he "snapped." The evidence presented was sufficient to prove that Defendant had the specific intent to kill or to inflict great bodily harm before entering the house. The verdicts indicate that the jury rejected Defendant's version of the facts. We find that this assignment of error is without merit.

Green, 62 So. 3d at 233–242.

Deferring to the Louisiana Fourth Circuit's findings of fact and looking at the evidence in the light most favorable to the State there are two insurmountable hurdles to Green's claim. First, Green's claim fails because there is strong evidence that he failed to prove two of the three essential elements of manslaughter (1) 'provocation' and (2) insufficient time for "self-control and cool reflection."[26] As the Fourth Circuit noted, Green knew his wife was having sex with another man and yet he still decided to go into the house.[27]   A reasonable juror could conclude that based

---

[26] La. Stat. Ann. § 14:31.  Reads: "manslaughter is a homicide that would be either first or second-degree murder, but the killing is committed in 'sudden passion' or 'heat of blood' immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection."
[27] State v. Green, 62 So. 3d at 24.

on that decision Green had unclean hands, and therefore could not claim 'provocation,' because he deliberately put himself in a position that he knew would cause emotional distress.

Even if the jury believed that Green was provoked into a 'sudden passion' a reasonable juror may have decided that Green did not prove his 'blood was still hot' while he committed the killings.[28]  The Louisiana Fourth Circuit noted, and the record reflects, that both Lionel Nelson and Marlin Green had time to flee the bedroom and time to dress before Green returned with the shotgun.[29] Furthermore, the design of the shotgun itself created ample opportunity for reflection because Green had to load each shot individually, from a pouch on the butt of the gun.[30]  Thus, Green would have had to load the shotgun four separate times, before pulling the trigger four more.[31]  There is even more evidence that Green's blood may have cooled in between killing Lionel Nelson and Marilyn Green. Specifically, Green told his mother after the shootings, "that he gave that b----h a dose," which provides ample evidence that Green was cool and collected when he killed Marilyn Green.[32] Given the overwhelming evidence, Green's irrational verdict claim lacks merit.

### 3.   Ineffective Assistance of counsel

Next, Green makes several different claims that his lawyer was ineffective at trial. Specifically, Green argues that counsel was ineffective because he failed to investigate, subpoena witnesses and documents, and object to the 911 call and indictment.[33] On post-conviction, the trial court denied all of Green's claims on the merits, explaining that Green's claim that trial counsel

---

[28] La. Stat. Ann. § 14:31.
[29] Id. at 242.
[30] Id.
[31] Id. Although Green claims that he only shot each victim once, this Court must defer to the factual findings of the State courts, which determined that Green shot each victim twice.  State v. Green, 62 So. 3d at 241.
[32] Green, 62 So. 3d 240.
[33] Rec. Doc. No. 1, p. 15-27.

was ineffective for failing to investigate lacked specificity.[34] The Court will address each claim in turn.

The appropriate standard for judging the performance of counsel was established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom. See 466 U.S. at 697. The petitioner has the burden of proving ineffective assistance of counsel by a preponderance of the evidence. See Montoya v. Johnson, 226 F.3d 399, 408 (5th Cir. 2000); Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1992). In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. See Amos v. Scott, 61 F.3d 333, 348 (5th Cir. 1995).

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F .3d 438, 450 (5th Cir. 2001), cert. denied, 534 U.S. 1163 (2002). "The defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687–88; see also Cantu v. Thaler, 632 F.3d 157, 163 (5th Cir. 2011). The analysis of counsel's performance must take into account the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances. See Strickland, 466 U.S. at 689; Carty v. Thaler, 583 F.3d 244, 258 (5th Cir. 2009). The reviewing court must "'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Roe v. Flores–Ortega, 528 U.S. 470, 477 (2000) (quoting Strickland, 466

---

[34] St. Rec. Vol. 1 of 5 (post-conviction judgement).

U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Harrington v. Richter, 131 S.Ct. 770, 787 (2011) (citing Strickland, 466 U.S. at 689).

In order to prove prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; see also Williams v. Thaler, 602 F.3d 291, 310 (5th Cir. 2010). Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice." Day v. Quarterman, 566 F.3d 527, 536 (5th Cir. 2009) (quoting Strickland, 466 U.S. at 695). In this context, "'a reasonable probability is a probability sufficient to undermine confidence in the outcome." Cullen, 131 S.Ct. at 1403 (quoting Strickland, 466 U.S. at. 694). This standard requires a "substantial," not just "conceivable," likelihood of a different result. Harrington, 131 S.Ct. at 791.

In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett v. McCotter, 796 F.2d 787, 793 (5th Cir. 1986). Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. See Miller v. Johnson, 200 F.3d 274, 282 (5th Cir.2000) (citing Ross v. Estelle, 694 F.2d 1008, 1012 (5th Cir. 1983)), cert. denied, 531 U.S. 849 (2000).

On habeas review, the United States Supreme Court has clarified that, in applying Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington, 131 S.Ct. at 788. The Harrington Court went on to recognize the high level

of deference owed to a state court's findings under <u>Strickland</u> in light of AEDPA standards of review:

> The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

<u>Id</u>. at 788 (citations and quotation marks omitted).

Thus, scrutiny of counsel's performance under § 2254(d) is "doubly deferential." <u>Cullen</u>, 131 S.Ct. at 1403 (quoting <u>Knowles v. Mirzayance</u>, 129 S.Ct. 1411, 1413 (2009)). The federal courts must take a "highly deferential" look at counsel's performance under the <u>Strickland</u> standard through the "deferential lens of § 2254(d)." Id. (citing <u>Strickland</u>, 466 U.S. at 689 and quoting <u>Knowles</u>, 129 S.Ct. at 1419 n. 2). Furthermore, the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." <u>Moore v. Johnson</u>, 194 F.3d 586, 591 (5th Cir. 1999) (citing <u>Strickland</u>, 466 U.S. at 689–90) see also <u>Matheson v. King</u>, 751 F.2d 1432, 1441 (5th Cir. 1985).

### i.   Failure to Investigate

Green first claims that his lawyer was ineffective was because he failed to investigate, i.e., test, Marilyn Green's underwear for seminal fluids.[35] Green alleges that had counsel tested the seminal fluid in Marilyn Green's underwear, the results would have shown that the sperm belonged to Lionel Nelson.[36] Green claims that counsel's decision prejudiced his defense because laboratory

---

[35] Rec. Doc. No., p. 50
[36] <u>Id</u>. at 51.

14

evidence that Lionel Nelson was having sex with Marilyn Green would have bolstered his claim that he walked in on the couple having sex and was therefore acting under a 'sudden passion.'[37]

The problem with the argument is that trial counsel's decision not to test the seminal fluids was not just a reasonable decision, it was prudent. See e.g. <u>Cummings v. Sirmons</u>, 506 F.3d 1211, 1223 n.2 (10th Cir.2007) cert. denied, 554 U.S. 907 (2008)(failure to request DNA testing upon hair was not ineffective assistance of counsel); <u>Thompson v. Cain</u>, 161 F.3d 802, 813–14 (5th Cir. 1998)(failure to do independent ballistics tests was not ineffective assistance of counsel); <u>Battle v. Delo</u>, 19 F.3d 1547, 1556–57 (8th Cir. 1994)(failure to obtain blood and saliva samples from a possible suspect was not ineffective assistance); <u>Grisby v. Blodgett</u>, 130 F.3d 365, 373 (9th Cir. 1997)(failure to have blood on a carpet tested was not ineffective assistance); <u>Garner v. Harry</u>, 2006 WL 3371128 *13 (E.D.Mich. 2006) (failure to obtain DNA test on semen was not ineffective assistance in defending a rape charge).

Green had a lot to lose, and little to gain, by testing the seminal fluid in Marilyn Green's underwear.  As it stood, there was no dispute that there was, in fact, seminal fluid in Marilyn Green's underwear, and there was strong evidence that it came from Lionel Nelson.[38]  Green himself testified that he walked in on the couple having sex, and the Fourth Circuit agreed, at least, with that portion of his testimony.[39]  Likewise, it would not be much of a leap for a juror, too, to conclude that Green's motive for killing Lionel Nelson and Marilyn Green was his jealousy and rage after seeing the two having sex.[40]

---

[37] <u>Id</u>.
[38] "Forensic tests were positive for seminal fluid on Marilyn Green's underwear" <u>Green</u>, 62 So. 3d at 235.
[39] "On the night of the murders, Defendant heard Marilyn engaging in sex, and by her turning the lights off, he was aware that she did not want to answer the door. "<u>Green</u>, 62 So. 3d at 241.
[40] "Forensic tests were positive for seminal fluid on Marilyn Green's underwear" <u>Green</u>, 62 So. 3d at 235.

On the flip side, a negative test result for Lionel Nelson's DNA would have been catastrophic for Green's manslaughter defense. In its closing, the State actually challenged Green's claim that he saw the two having sex, arguing that Green committed the killings "because he didn't have control over his ex-wife and the situation."[41] A negative test result about the sperm would have simultaneously eviscerated Green's credibility and made the State's case exponentially more persuasive. Considering the risk/reward of testing the underwear for DNA, trial counsel's decision was more than justified.

ii.  Failure to Subpoena Witnesses

Next, Green alleges that his counsel failed to interview and subpoena witnesses on his behalf.[42] Specifically, Green claims that counsel failed to interview Marilyn Green's neighbors, interview "any of the police or other State witnesses known to him",[43] and subpoena Ms. Brown to testify.[44] Green claims that he was prejudiced by these omissions because the neighbors would have provided testimony that "[Green] was not ostracized" but was "welcomed by the victim, Marilyn Green."[45] Green also claims that counsel's failure to interview the police caused prejudice because it "allowed [him] to become dependent upon the same entity that [was] attempting to incarcerate him…".[46] And finally, Green alleges that had Ms. Brown been called as a witness, she would have testified that only two shots were fired, rather than the four shots the State alleged.[47]

---

[41] Trial Transcript Vol 2 o 2, p. 202.
[42] Rec. Doc. No. 1, p. 49-61.
[43] Intertwined with Green's claim that counsel failed to interview State witnesses is a claim the counsel failed to "conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." Rec. Doc. No. 1 p. 52. This claim, too, is without merit. "A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." United States v. Green, 882 F.2d 999, 1003 (5th Cir.1989). Here, Green's vague and unsubstantiated allegation of trial counsel's failure to investigate falls short of Strickland's specificity requirement, and thus he can neither show that counsel's performance was deficient nor prejudice.
[44] Id.
[45] Rec. Doc. No. 1, p. 52.
[46] Id.
[47] Id.

In rebuttal, the State argues that Green has not identified any actual neighbors who might have testified on his behalf nor provided the contents of their testimony with any specificity.[48]  However, the State did not respond to Green's claim that his counsel was ineffective for failing to subpoena Ms. Brown.[49]

As a general rule, "'Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because the allegations of what a witness would have testified are largely speculative.'" Graves v. Cockrell, 351 F.3d 143, 156 (5th Cir. 2003) (quoting Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978)). Furthermore, the "'[f]ailure to present [evidence does] not constitute 'deficient' performance within the meaning of Strickland if [counsel] could have concluded, for tactical reasons, that attempting to present such evidence would be unwise.' "Williams v. Cockrell, 31 Fed. Appx. 832 (5th Cir.2002) (quoting Williams v. Cain, 125 F.3d 269, 278 (5th Cir. 1997)).   In order to demonstrate prejudice arising from failing to call witnesses, a petitioner must have identified the witnesses, explained the content of their proposed testimony, shown that their testimony would have been favorable to his defense, and demonstrated that the witnesses were available and willing to testify at trial. See Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009); See also Anthony v. Cain, Civ. Action 2009 WL 3564827, No. 07–3223 at 8 (E.D.La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; *rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue.*") (emphasis added).

All three of Green's claims are without merit because they are all based, to varying degrees, on speculation. His first two claims fail to identify a single witness that trial counsel could, or

---

[48] Rec. Doc. No. 15, p. 30.
[49] Rec. Doc. No. 15.

should, have called. Furthermore, he has not articulated what these potential witnesses would have testified to at trial. Although Green's final claim provides considerably more information and identifies a specific witness, Ms. Brown, he has not shown that the witness was available and willing to testify. [50] Graves, 351 F.3d at 156; Day, 566 F.3d at 538. Thus, Green is unable to demonstrate prejudice for all three of his uncalled witness claims.

### iii.   Failure to Subpoena Bankruptcy Records

Green also alleges that his counsel was ineffective for failing to subpoena the records of Green's bankruptcy.[51] Green's contention is that these records would show how he was "used as a financial provider and then cast away when he was no longer of use."[52] Without elaboration, Green claims these records would have gone to his state of mind, one of the elements for his manslaughter defense.[53] The claim is without merit.

Green has not provided the necessary factual foundation to prove either deficient performance or prejudice. First, he has failed to offer any evidence, such as affidavits from his counsel or other witnesses, proving that the bankruptcy records exist and that counsel did not find them and decide they were unhelpful. Without such evidence, Green has not shown that counsel performed deficiently. Further, even if he had shown deficient performance he would also have to prove that the bank records would have been beneficial to the defense. See Moawad v. Johnson, 143 F.3d 942, 948 (5th Cir.1998); see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir.2005); Wilson v. Cain, Civ. Action No. 06–890, 2009 WL 2163124, at *22 (E.D.La. July 16, 2009), aff'd, 641 F.3d 96 (5th Cir.2011); Davis v. Cain, Civ. Action No. 07–6389, 2008 WL 5191912, at *10 (E.D.La. Dec.11, 2008). Here Green's own testimony at trial belies his current—unsupported—

---

[50] Rec. Doc. No. 1, p.71.
[51] Rec. Doc. No. 1, p. 53.
[52] Id.
[53] Id.

claim that he was 'used' and then 'cast off.'  The testimony proves that everyone suffered through the bankruptcy and that Green was not being taken advantage of: "there was a lot of tension on *both of us* to pay this bankruptcy off."[54]  Not only has Green provided no supporting evidence that the bankruptcy records would have been beneficial, there is at least some evidence which indicates they may have actually undermined his defense.

### iv.   The 911 Tape

Next, Green claims that his trial counsel was ineffective because he failed to object to the admission of the 911 recordings as hearsay and a violation of his confrontation rights.[55] To support his claim, Green argues that the outcome of his trial would have been different "had the jury not been empowered by the emotion[al] effect [of the 911 call.]"[56] The State disputes Green's hearsay claim on the merits and argues that he failed to exhaust his confrontation claim.[57] The Court will address the State's exhaustion argument first.

Green has not raised this ineffective assistance of counsel confrontation claim before any of the state courts, either on direct appeal or during post-conviction.  Thus, Green's confrontation claim is unexhausted and his federal petition is therefore considered to be a mixed petition, containing both exhausted an unexhausted claims. The record discloses no good cause for Green's failure to properly and fully exhaust all of his claims and the Court can find none from its review of the record.  Rhines v. Weber, 544 U.S. 269, 277–78 (2005). Normally, the Court would recommend that Green's petition be dismissed without prejudice to allow him to pursue exhaustion of his claims in the appropriate state courts. However, the Court will instead

---

[54] Trial Transcript Vol. 2 of 2, p. 162; Rec. Doc. No. 1.
[55] Rec. Doc. No. 1, p. 53.
[56] Id.
[57] Rec. Doc. No. 15, p. 31.

recommend that Green's unexhausted confrontation claim be denied on the merits, pursuant to 28 U.S.C.A. § 2254(b)(2), for lack of prejudice.

Even, assuming *arguendo*, that counsel's performance was deficient by not objecting to the 911 call, Green has not shown prejudice.  To prove prejudice, Green had to allege with 'specificity' why the outcome of his trial would likely had been different had counsel objected. Barnard v. Collins, 958 F.2d 634, 642 (5th Cir. 1992).  ("In the absence of a *specific showing* of how these alleged errors and omissions were constitutionally deficient, and how they prejudiced his right to a fair trial, we [can find] no merit to these [claims]") (emphasis added). Instead, Green's argument that the jury was swayed by the general emotional impact of the calls is "conclusory," and therefore insufficient. [58]  See Miller, 200 F.3d at 282 ("this Court has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding.") (citing Ross, 694 F.2d at 1012).

Furthermore, the very core of Green's prejudice argument is flawed because it is unlikely that the emotional impact from the 911 calls, however strong, would have swayed the jury's verdict. The apparent basis for the emotional impact from the 911 calls was that a woman was heard screaming, followed by a loud blast, which ended in the line going dead.  However, at trial Green admitted to killing Lionel Nelson and Marilyn Green.[59] The sole issue for the jury was specific and narrow: was Green acting in a "heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection."[60] The 911 calls, however emotional, had a negligible effect on the ultimate outcome because they had

---

[58] Rec. Doc. No. 1, p. 53.
[59] Trial Transcript Vol. 2 p. 195-196.
[60] La.R.S. 14:31(A)(1).

no bearing on Green's state of mind. Thus, the 911 calls "relative role" in the "total context of [the] trial was insignificant." Crockett, 796 F.2d at 793.

v.   The Indictment

Next, Green claims that the indictment violated his due process rights because it did not identify the elements for his charges of second degree murder and his counsel was ineffective for failing to object based on that lack of specificity.[61] Neither claim has merit.

As a general rule, challenges to the validity of indictments are not cognizable on federal habeas review.  The United States Court of Appeals for the Fifth Circuit has held that "the sufficiency of a state indictment is not a matter for federal habeas corpus relief unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction." Liner v. Phelps, 731 F.2d 1201, 1203 (5th Cir. 1984) (quoting Branch v. Estelle, 631 F.2d 1229, 1233 (5th Cir. 1980)). The analysis for whether an indictment deprives the state of jurisdiction *'can be made only by looking to the law of the state where the indictment is issued*.' Johnson v. Estelle, 704 F.2d 232, 236 (5th Cir.1983)) (emphasis added); Johnson v. Beto, 383 F.2d 197, 198 (5th Cir. 1967).

Looking to Louisiana State law, it is clear that the "short-form" indictment used to charge Green was valid.  Short-form indictments are explicitly authorized by Louisiana Code of Criminal Procedure Article 465, which specifies the particular form that must be followed: "Second Degree Murder--A.B. committed second degree murder of C.D." Comparing Green's indictment with the statutory model shows that his indictment was valid because it matched the form in La. C. Crim. Proc. Art. 465.[62]

---

[61] Rec. Doc. No. 1, p. 57.
[62]     **FIRST COUNT**: THE GRAND JURORS of the State of Louisiana, duly impaneled and sworn in and for the body of the Parish of Orleans, in the name and by the authority of the said State, upon their oath find and PRESENT: **That JACKIE GREEN on the 25TH day of APRIL, 2009** in the Parish of Orleans,

Furthermore, "the constitutionality of the short forms has been consistently upheld [by the Louisiana Supreme Court]." State v. Liner, 373 So. 2d 121, 122 (La. 1979) (citing State v. Abney, 347 So.2d 498 (La. 1977); State v. James, 339 So.2d 741 (La.1976); State v. Sneed, 316 So.2d 372 (La. 1975)). The Louisiana Supreme Court has even specifically addressed Green's claim that the short-form indictment did not given enough notice of the charges against him by explaining that "it is intended that a defendant may procure details as to the statutory method by which he committed the offense through a bill of particulars." State v. Baylis, 388 So.2d 713, 718–19 (La.1980). Therefore, Green's claim regarding the sufficiency of the indictment is not a matter for federal habeas corpus review because it was clearly valid under state law and therefore was not so defective that the convicting court lacked jurisdiction.

Green's claim that trial counsel was ineffective for failing to object to the short-form indictment is likewise flawed. For the reasons discussed above, the indictment used to charge Green was valid. Trial counsel's performance can never be deficient for failing to make a specious objection. Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ...

---

aforesaid, and within the jurisdiction of the Criminal District Court for the Parish of Orleans, committed the **CRIME OF SECOND DEGREE MURDER OF MARILYN GREEN**, contrary to the form of Statute of the State of Louisiana in such cases made and provided and against the peace and dignity of the same.

**SECOND COUNT**: THE GRAND JURORS of the State of Louisiana, duly impaneled and sworn in and for the body of the Parish of Orleans, in the name and by the authority of the said State, upon their oath find and PRESENT: **That JACKIE GREEN on the 25TH day of APRIL, 2009** in the Parish of Orleans, aforesaid, and within the jurisdiction of the Criminal District Court for the Parish of Orleans, committed the **CRIME OF SECOND DEGREE MURDER OF LIONEL NELSON**, contrary to the form of Statute of the State of Louisiana in such cases made and provided and against the peace and dignity of the same.

St. Rec. Vol. 1 of 5

cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

### 4.   <u>Confrontation</u>

Green claims his right to confront his accusers was violated when he was prevented from cross examining Dr. Huber, the doctor who performed the autopsy on Marilyn Green. However, as discussed below, Green's confrontation claim is not cognizable for federal habeas review.

Confrontation claims are 'mixed' questions of law and fact and thus fall under the purview of § 2254(d)(1). <u>Gochicoa v. Johnson</u>, 118 F.3d 440, 445 (5th Cir. 1997)) (noting violation of Sixth Amendment confrontation right is mixed question of fact and law); <u>Livingston v. Johnson</u>, 107 F.3d 297, 309 (5th Cir. 1997) (admissibility of evidence); <u>Lilly v. Virginia</u>, 527 U.S. 116, 136, 148 (1999) ("Deciding whether a particular statement bears the proper indicia of reliability under our Confrontation Clause precedent 'may be a mixed question of fact and law,' but the mix weighs heavily on the 'fact' side."); <u>accord</u> <u>Fratta v. Quarterman</u>, 536 F.3d 485, 499 (5th Cir. 2008).

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. This "bedrock procedural guarantee" is applicable in both federal and state prosecutions. <u>Crawford v. Washington</u>, 541 U.S. 36, 42 (2004). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." <u>Maryland v. Craig</u>, 497 U.S. 836, 845 (1990). The Confrontation Clause therefore prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross examination. <u>Crawford</u>, 541 U.S. at 59.

23

In Melendez–Diaz v. Massachusetts, the Supreme Court expanded the definition of testimonial statements to include statements that are "functionally identical to live, in-court testimony." 557 U.S. 305, 310–11 (2009). The Court held that the prosecution violated the defendant's right to confrontation by admitting certificates of analysis identifying a substance found in the defendant's possession as cocaine. See Id. at 329.

More recently, the Supreme Court reiterated that "[u]nder settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true." Williams v. Illinois, ——U.S. ——, 132 S.Ct. 2221, 2228 (2012). According to Williams, out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which the expert's opinion rests "are not offered for their truth and thus fall outside the scope of the Confrontation Clause." Id. Moreover, an out-of-court statement is testimonial only if it has "the primary purpose of accusing a targeted individual of engaging in criminal conduct" and, usually, it involves a "formalized statement[ ], such as affidavits, depositions, prior testimony, or confessions." Id. at 2242.

Despite the abundance of Supreme Court precedent on the Confrontation Clause, there is wide-spread uncertainty about whether an autopsy report is 'testimonial.' The United States First Circuit Court of Appeals aptly summarized the confusion on this issue:

> When other courts, post Melendez–Diaz, have been confronted with the question of whether autopsy reports are testimonial or not, disparity of treatment has reigned. On the one hand, some courts have concluded that autopsy reports are not testimonial. See, e.g., United States v. James, 712 F.3d 79, 99 (2d Cir. 2013) (deciding that the autopsy report at issue "was not testimonial because it was not prepared primarily to create a record for use at a criminal trial"), cert. denied, —— U.S. ——, 134 S.Ct. 2660, 189 L.Ed.2d 208, 2014 WL 2178370 (May 27, 2014); People v. Dungo, 55 Cal.4th 608, 147 Cal.Rptr.3d 527, 286 P.3d 442, 450 (2012) (finding that even though California's statutory scheme required the reporting of suspicious autopsy findings to law enforcement, an autopsy serves several purposes and the "autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not

testimonial"); Banmah v. State, 87 So.3d 101, 103 (Fla.Dist.Ct.App.2012) (concluding that autopsy reports are not testimonial because they are made pursuant to a statutory duty and not, in all instances, used in prosecutions); People v. Cortez, 402 Ill.App.3d 468, 341 Ill.Dec. 854, 931 N.E.2d 751, 756 (2010) (finding that Melendez–Diaz did not upset the court's prior holdings that autopsy reports are business records without Crawford implications).

On the flip side, courts have come down the other way, finding autopsy reports testimonial and affording them the protection of the Confrontation Clause. See, e.g., United States v. Ignasiak, 667 F.3d 1217, 1231 (11th Cir.2012) (holding that, applying the logic of Crawford, Melendez–Diaz, and Bullcoming, the autopsy reports at issue were testimonial); Commonwealth v. Avila, 454 Mass. 744, 912 N.E.2d 1014, 1029, 1030 n. 20 (2009) (finding that the medical examiner's autopsy report statements were testimonial); Cuesta–Rodriguez v. State, 241 P.3d 214, 228 (Okla.Crim.App.2010) (holding that in light of Oklahoma's statutory scheme relative to the medical examiner's duty in the case of a suspicious death, an autopsy report in such cases would be testimonial); Wood v. State, 299 S.W.3d 200, 209–10 (Tex.Ct.App.2009) (holding that although not all autopsy reports are testimonial, given the suspect nature of the victim's death, the subject autopsy report was testimonial).

Hensley v. Roden, 755 F.3d 724, 733-34 (1st Cir. 2014).[63]

Given the absence of clearly established federal precedent on the Confrontation Clause's application to autopsy reports created by other, non-testifying experts, the state courts did not contravene, or unreasonably apply, clearly established Supreme Court Jurisprudence.  See

Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009) (holding

---

[63] See also Nardi v. Pepe, 662 F.3d 107, 112 (1st Cir. 2011) ("[E]ven now[, after Melendez–Diaz and Bullcoming,] it is uncertain whether, under its primary purpose test, the Supreme Court would classify autopsy reports as testimonial"); McNeiece v. Lattimore, 501 Fed. Appx. 634, 2012 WL 6757956 (9th Cir. Dec. 18, 2012) (holding that a state court determination that petitioner's rights under the Confrontation Clause were not violated when the trial court admitted excerpts of an autopsy report into evidence through the testimony of a pathologist who had not conducted autopsy and where the pathologist testified in reliance on the autopsy report, was not contrary to or an unreasonable application of Crawford and that the state court's decision that the autopsy report was a non-testimonial business record was not based on an unreasonable determination of the facts); Madrid v. Ercole, No. 08-CV-4397 (ENV), 2015 WL 7779207, at 9 (E.D.N.Y. Dec. 2, 2015) (holding that counsel's failure to object to the admission of an autopsy report by a witness other than the medical examiner who performed did not constitute ineffective assistance of counsel because the defendant's right to cross examination was not violated; but see United States v. Rose, 587 F.3d 695, 701 (5th Cir. 2009) (Citing with approval Wood v. State, 2009 WL 3230848, at 6 (Tex.App. Austin Oct.7, 2009) (finding Confrontation Clause violation where chief medical examiner, not present at an autopsy, testified to the contents of the resulting autopsy report)).

that "it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the United States Supreme Court]"); Carey v. Musladin, 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) ("Given the lack of holdings from [the United States Supreme Court] regarding" the claim, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'") Therefore, this Court is bound to honor the state court's decision on the merits pursuant to 28 U.S.C. § 2254(d)(1).

### 5.   Expert Testimony

Green's final claim is that his Fifth, Sixth and Fourteenth Amendment rights were violated when the trial court allowed Kenny Leary to testify as an expert firearms examiner.[64] Specifically, Green alleges that Leary's qualifications were inadequate because Leary did not have any formal training and accreditations in firearms, nor did he pursue continuing firearms education.[65] In its judgment denying Green's post-conviction claim, the trial court explained that it was very familiar with Leary's training and career and that it expected to qualify Leary again in the future.[66]

During the voir dire of Leary's credentials, he testified that was trained by his Sergeant, Alan Tidwell, and Jim Churchman, the Assistant Crime Lab Director for the State Police Crime Lab in Baton Rouge.[67] He also testified that he attended various seminars and workshops and that he had previously been admitted as an expert witness in several different courts.[68] Once Leary was qualified, he testified that, by weighing the pellets used in the shooting, he determined that the shot used to kill Lionel Nelson and Marilyn Green was single and double ought

---

[64] Rec. Doc. No. 1, p. 64-66.
[65] Id. at 65-66.
[66] St. Rec. Vol. 1 of 5, (post-conviction judgement).
[67] Trial Transcript Vol. 2 of 2, p. 121.
[68] Id. at 122.

buckshot.[69]  He also gave his opinion that Marilyn Green *might* have been shot twice because the

twenty pellets that were extracted from her body during the autopsy exceeded the average fifteen

pellets he found in the shells in his lab.[70]

As a general rule, state court evidentiary rulings, including rulings on expert witnesses,

are issues of state law, and such state law determinations simply are not reviewable in a federal

habeas corpus proceeding because this Court can only review constitutional challenges.[71]

Manning v. Warden, Louisiana State Penitentiary, 786 F.2d 710, 711 (5th Cir. 1986).

Nevertheless, some evidentiary errors are so egregious that they rise to a constitutional magnitude,

thereby conferring jurisdiction on this Court.[72]  Manning, 786 F.2d at 711-12. The rule in such cases,

"when there has been a violation of state procedure, is to determine whether there has been a

constitutional infraction of a defendant's due process rights which would *render the trial as a

whole 'fundamentally unfair.'*  Manning, 786 F.2d at 711-12; (quoting Nelson, 642 F.2d at 905–

---

[69] Id. at 124, 127-28.

[70] Id. at 125.

[71] "Daubert is an exegesis of Rule 702 of the Federal Rules of Civil Procedure and governs the admission of expert evidence in federal trials only. Daubert does not bind the states, which are free to formulate their own rules of evidence subject only to the limits imposed by the Constitution." Kinder v. Bowersox, 272 F.3d 532, 545 n. 9 (8th Cir.2001). However in State v. Foret, 628 So.2d 1116, 1121–23 (La. 1993), the Louisiana Supreme Court adopted the Daubert standard for Louisiana courts.

[72] The initial inquiry for whether there was an erroneous ruling requires an examination of state evidentiary law. Here, the Louisiana Supreme Court adopted the guidelines set forth by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc. for determining the reliability of expert scientific testimony. 509 U.S. 579, 592–95, 113 S.Ct. 2786, 2796–98 (1993); State v. Foret, 628 So.2d 1116, 1121–23 (La. 1993). Those guidelines established three non-exclusive factors to be considered in determining the admissibility of expert testimony: (1) the "testability" of the scientific theory or technique; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the methodology is generally accepted in the scientific community. Id. In addition to Daubert, the Louisiana Supreme Court added a second three-part inquiry to more fully assist district courts in determining the admissibility of expert testimony, with the Daubert analysis serving as one of the three prongs. Cheairs v. State ex rel. Department of Transp. and Development, 861 So.2d 536, 542 (La. 2003). This three-prong inquiry allows the admission of expert testimony only if all three prongs are true: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. Id.

06 (citations omitted)(emphasis added)). A "fundamentally unfair" error is one that "played a crucial, critical, and highly significant role in the trial." <u>Little</u>, 162 F.34 at 862.

Here, Green has failed to establish that the state courts' ruling regarding the admissibility of Leary's testimony were erroneous, much less, so egregiously erroneous as to render his trial fundamentally unfair. Green has presented no basis to question the reliability of the tests performed by Leary under <u>Daubert,</u> or explained why those tests exceeded his qualifications.  To the contrary, Leary's necessary expertise did not extend past weighing and counting shotgun pellets, a task that was certainly within the grasp of someone with twenty years of experience with firearms. Given Leary's qualifications and experience, the limited scope of his opinion testimony and the insignificance that testimony had on the trial, it cannot be said that the state court's admission of his expert testimony rendered the trial fundamentally unfair.

## **RECOMMENDATION**

For the foregoing reasons, **IT IS RECOMMENDED** that Green's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).

New Orleans, Louisiana, this 13th day of May, 2016.


**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**